## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JAMES R. MORIARTY, Individually as the** | ) | |
| **Father of JAMES FRANCIS MORIARTY** | ) | |
|     **4119 Montrose, Suite 250** | ) | |
|     **Houston, Texas 77006** | ) | |
| | ) | |
| **CYNTHIA REED MORIARTY,** | ) | |
| **Individually as the Mother of JAMES** | ) | |
| **FRANCIS MORIARTY and as the** | ) | |
| **Executor of the ESTATE OF JAMES** | ) | |
| **FRANCIS MORIARTY** | ) | |
|     **2169 Oak Alley** | ) | |
|     **Kerrville, Texas 78028** | ) | |
| | ) | |
| **REBECCA ANNE MORIARTY, Individually** | ) | **COMPLAINT** |
| **as the Sister of JAMES FRANCIS MORIARTY** | ) | |
|     **2207 Huldy Street** | ) | |
|     **Houston, Texas 77019** | | |
| | ) | **Case No.: _____** |
| **MELISSA KAY MORIARTY, Individually** | ) | |
| **as the Sister of JAMES FRANCIS MORIARTY** | ) | |
|     **1601 Churchill Downs Drive** | ) | |
|     **Aberdeen, North Carolina 28315** | ) | |
| | ) | |
| **CHARLES DUWANE LEWELLEN, JR.,** | ) | |
| **Individually as the Father of MATTHEW** | ) | |
| **CHARLES LEWELLEN and as the Executor** | ) | |
| **of the ESTATE OF MATTHEW CHARLES** | ) | |
| **LEWELLEN** | ) | |
|     **16451 State Hwy B** | ) | |
|     **Kirksville, Missouri 63501** | ) | |
| | ) | |
| **CYNTHIA MARIE LEWELLEN, Individually** | ) | |
| **as the Mother of MATTHEW CHARLES** | ) | |
| **LEWELLEN** | ) | |
|     **16451 State Hwy B** | ) | |
|     **Kirksville, Missouri 63501** | ) | |
| | ) | |
| **JAMES ANDREW LEWELLEN, Individually** | ) | |
| **as the Brother of MATTHEW CHARLES** | ) | |
| **LEWELLEN** | ) | |
|     **504 Bridgewater Court** | ) | |
|     **St. Charles, Missouri 63304** | ) | |
| | ) | |

DANIELLE GATEWOOD (NEE LEWELLEN) )
Individually as the Sister of MATTHEW )
CHARLES LEWELLEN )
    704 Claystone Court )
    Clarksville, Tennessee 37040 )
     )
RENEE LAQUE, Individually as the Fiancee )
of MATTHEW CHARLES LEWELLEN )
    3321 Golf Club Lane )
    Nashville, Tennessee 37215 )
     )
BRIAN M. McENROE, Individually as the )
Father of KEVIN JOSEPH McENROE and as )
the Personal Representative of the ESTATE OF )
KEVIN JOSEPH McENROE )
    6410 Liberty Avenue )
    Bradenton, Florida 34203 )
     )
LINDA L. FROST, Individually as the Mother )
of KEVIN JOSEPH McENROE )
    6890 E. Sunrise #120 )
    Tucson, Arizona 85750 )
     )
NICHOLAS McENROE, Individually as the )
Brother of KEVIN JOSEPH McENROE )
    316 Blackman Rd. )
    Nashville, Tennessee 37211 )
     )
CHRISTOPHER McENROE, Individually as )
the Brother of KEVIN JOSEPH McENROE )
    238 Brookridge Trail )
    Nashville, Tennessee 37211 )
     )
KIMBERLY ARGO, Individually as the )
Fiancee of KEVIN JOSEPH McENROE )
    90 Mix Ave #700 )
    Hamden, CT 06514 )
     )
         Plaintiffs, )
     )
v. )
     )
THE HASHEMITE KINGDOM OF JORDAN )
    Ministry of Foreign Affairs )
    Queen Alia Airport Street )
    Amman, Jordan )

|   |   |
|---|---|
| **MA'AREK AL-TAWAYHA a/k/a** | ) |
| **"ABU TAYEH"** | ) |
| **c/o Ministry of Foreign Affairs** | ) |
| **Queen Alia Airport Street** | ) |
| **Amman, Jordan** | ) |
|   | ) |
| **Defendants.** | ) |
|   | ) |

_____

## COMPLAINT

### I.      NATURE OF THE CASE

1.      On November 4, 2016, three members of the United States Army's Special Forces were murdered near Al-Jafr, Jordan on King Faisal Air Base that was home to American military and intelligence operations related to the training and equipping of Syrian opposition forces who were opposing the regime of Bashar al-Asad in Syria.

2.      While a Jordanian Air Base, King Faisal Air Base served as the home base for American Special Forces units who were working in conjunction with the U.S. Government to provide tactical training in weapons and explosives to these Syrian opposition fighters.

3.      The perpetrator of the attack was a First Sergeant in the Jordanian military who was on duty at the guard post at the entrance to King Faisal Air Base – a position where he had personally witnessed American soldiers come in and leave from the Air Base on countless prior occasions leading up to the November 4, 2016 attack.

4.      The three United States Army Special Forces members who were killed were James "Jimmy" Francis Moriarty, Matthew "Matt" Lewellen, and Kevin Joseph McEnroe.  Their families seek justice for their unnecessary deaths and believe that the Hashemite Kingdom of Jordan aided and abetted this terrorist act by seeking to silence the families and hiding behind the defense that

the Jordanian soldier who hunted down and brutally murdered their loved ones was acting within

internationally accepted rules of engagement.

5.      Plaintiffs, through their undersigned attorneys, bring this Complaint seeking

damages arising from the death of their loved ones.

## II.      JURISDICTION AND VENUE

6.      Jurisdiction arises pursuant to 28 U.S.C. §§ 1330, 1331, 1605(a)(1), and 1605B(b).

Jurisdiction also arises against Defendant Ma'arek Al-Tawayha based on violations of the Torture

Victim Protection Act ("TVPA"), Pub. L. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C. § 1350

note). Jurisdiction also arises pursuant to 18 U.S.C. § 2334.

7.      Venue in this district is appropriate pursuant to 28 U.S.C. §§ 1391(c) and

1391(f)(4).

8.      As herein alleged, actions against Defendant Hashemite Kingdom of Jordan

seeking money damages against a foreign state for physical injury to person or property or death

occurring in the United States caused by an act of international terrorism in the United States and

a tortious act of any employee of that foreign state acting within the scope of his or her office,

employment, or agency fall within the exception to jurisdictional immunity provided by 28 U.S.C.

§ 1605B(b).

## III.     DEFENDANTS

9.      Defendant Hashemite Kingdom of Jordan ("Jordan") is a foreign state within the

meaning of 28 U.S.C. § 1391(f) located in the Middle East sharing borders with Saudi Arabia to

the east, Iraq to the northeast, Syria to the north, Israel to the west, and West Bank to the west.

10.     According to the United States Department of State, "The United States is Jordan's

single largest provider of bilateral assistance, providing over $1.7 billion in 2017, including $1.3

billion in bilateral foreign assistance and over $200 million in Department of Defense (DoD) support…. A strong U.S. military assistance program is designed to meet Jordan's legitimate defense needs, including preservation of border integrity and regional stability through the provision of materiel and training."[1]

11.     In 1996, the United States and Jordan negotiated an informal diplomatic agreement regarding the status of U.S. military personnel and civilian employees of the Department of Defense who may be present in Jordan in connection with their official duties. This agreement provides U.S. military personnel within Jordan that same status as that provided to the Technical and Administrative Staff of the United States Embassy; permits them to enter and exit Jordan with U.S. Government identification; authorizes them to wear their uniforms while performing their official duties and to carry arms while on duty in accord with their orders; provides them with free entry into and landing upon the territory of Jordan; and exempts them from taxes or duties imposed by Jordan.

12.     Defendant Ma'arek Al-Tawayha a/k/a "Abu Tayeh" ("Abu Tayeh") is a resident of Jordan who was, at all times relevant to this case, a member of the Jordanian military. On November 4, 2016, Defendant Abu Tayeh was assigned to security duty at the entrance to King Faisal Air Base near Al-Jafr, Jordan.

13.     Defendant Abu Tayeh was criminally prosecuted for his role in the murder of James Francis Moriarty, Matthew Charles Lewellen, and Kevin Joseph McEnroe on November 4, 2016. His sentence was handed down by a Jordanian court in July 2017, and upon information and belief, Defendant Abu Tayeh is currently in prison in Jordan based on his conviction.

---

[1] *See* Bureau of Near Eastern Affairs, *U.S. Relations with Jordan*, U.S. Dep't of State (Aug. 2, 2018), https://www.state.gov/r/pa/ei/bgn/3464.htm.

## II.     FACTUAL ALLEGATIONS

### A.     The November 4, 2016 Assault by Defendant Abu Tayeh

14.     Members of the United States Army's Special Forces Operational Detachment-Alpha ("SFOD-A") had been deployed from Fort Campbell, Kentucky to the Hashemite Kingdom of Jordan on or about July 11, 2016 to provide military training in the vicinity of King Faisal Air Base near Al-Jafr, Jordan.

15.     Upon information and belief, this military training in Jordan was to train opposition fighters to be engaged in combat in Syria's ongoing civil war.

16.     Staff Sergeant ("SSG") James Francis Moriarty had been in Jordan since July 2016 as part of this training mission as part of SFOD-A.

17.     Staff Sergeant ("SSG") Matthew Charles Lewellen (who was promoted posthumously to Sergeant First Class ("SFC")), Staff Sergeant ("SSG") Kevin Joseph McEnroe, and a fourth member of SFOD-A had arrived in Jordan only a few days prior to November 4, 2016 as reinforcements from Fort Campbell, Kentucky to continue providing military training in the vicinity of King Faisal Air Base near Al-Jafr, Jordan.[2]

18.     Each of the American soldiers maintained at least an intermediate language proficiency in Modern Standard Arabic and had conducted additional language training in Levantine Arabic.

19.     The base of operations for SFOD-A during this mission was King Faisal Air Base near Al-Jafr, Jordan – approximately 140 miles from Jordan's capital of Amman.

---

[2] The name of the fourth SFOD-A member in the attack is being withheld as, upon information and belief, he remains in the United States Army as a member of the United States Army's Special Forces Operational Detachment-Alpha. He will be referenced as "the fourth SFOD-A member."

20.     There was a single access control point into King Faisal Air Base, and a Jordanian security officer was stationed at this access control point to facilitate identification and transit on and off the base.

21.     U.S.-operated vehicles were familiar to the Jordanian guard force at the entrance to King Faisal Air Base and were identifiable as friendly given this was their base of operations in Jordan.

22.     On November 4, 2016, members of the SFOD-A – including SSG Moriarty, SSG Lewellen, and SSG McEnroe – departed King Faisal Air Base at approximately 8:00am to conduct routine weapons training on a military range approximately five kilometers from the perimeter of the base.

23.     After completing their training, the team members returned to the base in three convoys.   The first convoy returned through the access control point without incident at approximately 11:40am.

24.     At approximately 12:04pm, the second convoy arrived at the access control point to King Faisal Air Base.

25.     The second convoy was comprised of four vehicles carrying five members of SFOD-A.   There was one soldier in the first vehicle in this convoy.   SSG Lewellen and SSG McEnroe were in the second vehicle.   One soldier was in the third vehicle.   SSG Moriarty was in the fourth vehicle.

26.     As the vehicles approached the access control point, the U.S. soldiers did not detect any fear or concern on the part of the Jordanian soldiers manning the entry.

27.     A Jordanian soldier lifted a counterbalanced gate and motioned for the American vehicles to proceed to the final slide gate protecting the entrance to the base.

28.     The first vehicle proceeded past the access control point which was manned by Defendant Abu Tayeh (a First Sergeant in the Jordanian military at the time) and stopped in front of the final slide gate protecting the entrance.

29.     A Jordanian soldier opened the slide gate, and the first vehicle in the four-vehicle convoy proceeded unimpeded through the entrance and down the entrance road.

30.     The second vehicle carrying SSG Lewellen and SSG McEnroe proceeded to follow the first vehicle through the final slide gate – which remained open – when their vehicle abruptly stopped as Defendant Abu Tayeh began shooting into the cab of their truck from his location in the access control point's guard shack that was approximately three meters from the driver's side window of the truck carrying SSG Lewellen and SSG McEnroe.

31.     After firing shots from the side of the vehicle, Defendant Abu Tayeh fired additional rounds into the second vehicle after exiting the guard shack.

32.     SSG Lewellen and SSG McEnroe never drew their weapons to instigate the shooting, and no actions were taken that would have necessitated the continued shooting into the vehicle carrying SSG Lewellen and SSG McEnroe.

33.     SSG McEnroe was driving the second vehicle in the convoy and died on the scene having never drawn a weapon or made any initiating action against Defendant Abu Tayeh.

34.     SSG Lewellen sustained two gunshot wounds and was treated on the scene of the attack and died in transport to receive additional medical care having never drawn a weapon or made any initiating action against Defendant Abu Tayeh.

35.     Prior to the shots from Defendant Abu Tayeh being fired, the Jordanian guard operating the counterbalanced lift gate behind the vehicle convoy showed no indication that he heard any sounds that would have prompted Defendant Abu Tayeh to begin shooting.  His first

reaction occurred when Defendant Abu Tayeh began shooting at the vehicle carrying SSG Lewellen and SSG McEnroe. Once the shots were fired, he hid behind a cement barrier for the duration of the assault.

36.     After shooting at the vehicle carrying SSG Lewellen and SSG McEnroe (who was killed almost immediately due to a gunshot to his head), Defendant Abu Tayeh walked past the second vehicle in the convoy (which was rolling forward as SSG McEnroe was no longer capable of depressing the brakes on the vehicle) and began shooting at the third and fourth vehicles in the convoy with the fourth vehicle being occupied by SSG Moriarty.

37.     As the shooting from Defendant Abu Tayeh continued, a Jordanian soldier can be seen peering out and subsequently retreating back into his guard shack for the duration of the assault.

38.     SSG Moriarty and the fourth SFOD-A member immediately exited their vehicles carrying pistols and began returning fire against Defendant Abu Tayeh.

39.     Defendant Abu Tayeh – demonstrating his murderous intent – continued to fire on the American soldiers with his M16 rifle, and SSG Moriarty and the fourth SFOD-A member retreated behind cement barriers immediately adjacent to their car doors.

40.     Defendant Abu Tayeh was equipped with body armor and an automatic rifle putting him at a superior advantage over the American soldiers who were not wearing body armor and were limited to service pistols that they carried with them in their vehicles.

41.     While behind the cement barriers, SSG Moriarty called out to Defendant Abu Tayeh in Arabic identifying himself and seeking to de-escalate the situation; however, when he raised both hands to show he was not a threat, Defendant Abu Tayeh continued to fire at the

concrete barrier.  In a video of the assault, shots can be seen ricocheting off the cement wall during this attempt to de-escalate this terrorist attack.

42.     SSG Moriarty and the fourth SFOD-A member also tried to hail assistance from a vehicle that was traveling along the local roadway, past the access control point; however, there was no response from the occupants of the vehicle.

43.     Additionally, SSG Moriarty tried to get the attention of fellow American soldiers who pulled up short of the access control point during the incident, but to no avail.

44.     As Defendant Abu Tayeh continued to shoot at them, SSG Moriarty and the fourth SFOD-A member decided to increase the distance between them and Defendant Abu Tayeh, so the two Americans ran past their vehicles and took up defensive positions behind additional cement barriers on the opposite side of their vehicles from where Defendant Abu Tayeh was standing.

45.     When the two Americans fell back to the opposite side of the vehicles, Defendant Abu Tayeh jogged forward and surveilled the interior of the vehicle that had been driven by fourth SFOD-A member while continuing to point his weapon in the direction of where the two Americans had fallen back.

46.     Defendant Abu Tayeh then proceeded to move forward until he was in front of the vehicle that had been driven by SSG Moriarty and rested his elbows on the hood of the vehicle as he continued to point his M16 rifle in the direction of the two Americans.

47.     First Sgt. Al-Tawayha then circled around the driver's side of SSG Moriarty's vehicle and ran in the direction of the Americans firing with his rifle.

48.     The fourth SFOD-A member circled one of the cement barriers to get out of the line of fire, and SSG Moriarty approached Defendant Abu Tayeh and began firing to distract him while standing only a few paces apart.

49.     SSG Moriarty sustained two gunshot wounds from close range to his chest cavity in the confrontation with Defendant Abu Tayeh.  At least one of the gunshot wounds sustained by SSG Moriarty penetrated his heart.

50.     As Defendant Abu Tayeh shot SSG Moriarty, the fourth SFOD-A member flanked Defendant Abu Tayeh and repeatedly fired at him with his service pistol thus disabling him and ending the confrontation as the shots circumvented Defendant Abu Tayeh's body armor.

51.     The fourth SFOD-A member disarmed First Sgt. Al-Tawayha, apprehended the Jordanian guard who operated the counter balanced lift gate, and ran to the American vehicle outside the access control point because he was uncertain whether the hostilities had ended.

52.     When the Americans attempted to return to SSG Moriarty's body, Jordanian personnel prevented them from doing so, firing warning shots near their vehicle.

53.     Eventually, SSG Moriarty and SSG Lewellen's bodies were transported to aid stations at the base – SSG Lewellen initially to the Jordanian aid station, and SSG Moriarty to the American aid station.  SSG Lewellen was placed on a gurney next to Defendant Abu Tayeh at the Jordanian aid station.  SSG Lewellen was subsequently transferred to the American aid station.

54.     Both SSG Moriarty and SFC Lewellen sustained two gunshot wounds.

55.     Approximately 80 minutes after the shooting began, SSG Moriarty and SSG Lewellen were placed in a fixed-wing aircraft for transport to Marka Airfield in Amman for emergency medical assistance.  Approximately 15 minutes into the flight, SSG Moriarty was declared dead.

56.     SSG Lewellen arrived at Marka Airfield and was transferred to a helicopter to take him to King Hussein Hospital in Amman approximately two hours after the shooting began, but he was pronounced dead at King Hussein Hospital.

B.     **Plaintiffs and Their Damages**

1.     **The Estate of James Francis Moriarty**

57.     SSG James Francis Moriarty was born in 1989 in Texas.  He was a United States citizen at the time of his death and was domiciled in the State of Texas.

58.     After graduating from the University of Texas at Austin with a Bachelor of Arts degree in Economics, he enlisted in the United States Army in September 2011.

59.     In 2012, he completed Airborne training, and in early-2014, he completed Special Forces training to become what is commonly referred to as a "Green Beret."

60.     SSG Moriarty was assigned to the U.S. Army's Fifth Special Forces Group based out of Fort Campbell, Kentucky.

61.     His role within his unit was as a Special Forces Weapons Sergeant.

62.     SSG Moriarty had arrived in Jordan in July 2016 having previously served two other deployments in Jordan in 2015 and 2016.

63.     Throughout the assault carried out by Defendant Abu Tayeh, SSG Moriarty was acutely aware of the danger posed to his life as he knew that his pistol and no body armor were no match to Defendant Abu Tayeh's automatic weapon and body armor.

64.     His fellow soldiers described him as a soldier who refused to cut corners but who was also an affable storyteller whose stories would captivate his audience.

65.     In the assault, SSG Moriarty sustained two gunshot wounds that proved fatal; however, his body fought the injuries he sustained, and he did not succumb to his wounds until approximately 95 minutes after the shooting assault began when he was declared dead aboard an aircraft en route to Marka Airfield in Amman, Jordan.

66.     Plaintiff James R. Moriarty is a citizen of the United States and resides in the city of Houston, Texas.  Plaintiff James R. Moriarty asserts claims herein in his capacity as the father of James Francis Moriarty.

67.     Plaintiff Cynthia Moriarty is a citizen of the United States and resides in the city of Kerrville, Texas.  Plaintiff Cynthia Moriarty asserts claims herein as the Executor of the Estate of James Francis Moriarty and in her capacity as the mother of James Francis Moriarty.

68.     Plaintiff Rebecca Anne Moriarty is a citizen of the United States and resides in the city of Houston, Texas.  Plaintiff Rebecca Anne Moriarty asserts claims herein in her capacity as the sister of James Francis Moriarty.

69.     Plaintiff Melissa Kay Moriarty is a citizen of the United States and resides in the city of Aberdeen, North Carolina.  Plaintiff Melissa Kay Moriarty asserts claims herein in her capacity as the sister of James Francis Moriarty.

70.     As a result of the attack, and the death of James Francis Moriarty, Plaintiffs James R. Moriarty, Cynthia Moriarty, Rebecca Anne Moriarty, and Melissa Kay Moriarty have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

**2.     The Estate of Matthew Charles Lewellen**

71.     SSG Lewellen (posthumously promoted to the rank of SFC) was born in 1989 in Kirksville, Missouri.  He was a United States citizen at the time of his death and was domiciled in the State of Tennessee.

72.     After attending both Truman State University and the University of Kansas, SFC Lewellen enlisted in the United States Army in February 2010.

73.     SFC Lewellen completed Airborne training and graduated from Special Forces training on November 1, 2012.

74.     SFC Lewellen was assigned to the U.S. Army's Fifth Special Forces Group based out of Fort Campbell, Kentucky.

75.     His role within his unit was as a Special Forces Engineer Sergeant.

76.     SFC Lewellen had arrived in Jordan only days prior to the attack by Defendant Abu Tayeh.  He had been deployed to Jordan on one prior occasion.

77.     At no point did SFC Lewellen pose any risk of harm to Defendant Abu Tayeh or the other Jordanian soldiers at the access control point.

78.     SFC Lewellen had dreamed of being a solder since the third grade, and he received numerous commendations for his stellar performance in the United States Army.  Individuals who served with SFC Lewellen said that he was instrumental in raising morale in difficult situations.

79.     In Tennessee, he lived with his fiancée Renee Laque and their dog Charlie, and family was always important to him.

80.      SFC Lewellen was in the passenger seat of the second vehicle in the four-vehicle caravan and the first vehicle to receive fire from Defendant Abu Tayeh.  In the initial shots fired by Defendant Abu Tayeh, SFC Lewellen sustained two gunshot wounds. He survived the ordeal of being flown to Amman, Jordan for treatment for his injuries; however, he was declared dead from his wounds at King Hussein Hospital in Amman approximately two hours after he had been shot by Defendant Abu Tayeh.

81.     Plaintiff Charles Duwane Lewellen, Jr. is a citizen of the United States and resides in the city of Kirksville, Missouri.  Plaintiff Charles Duwane Lewellen, Jr. asserts claims herein as

the Executor of the Estate of Matthew Charles Lewellen and in his capacity as the father of Matthew Charles Lewellen.

82.     Plaintiff Cynthia Marie Lewellen is a citizen of the United States and resides in the city of Kirksville, Missouri.  Plaintiff Cynthia Marie Lewellen asserts claims herein in her capacity as the mother of Matthew Charles Lewellen.

83.     Plaintiff James Andrew Lewellen is a citizen of the United States and resides in the city of St. Charles, Missouri.  Plaintiff James Andrew Lewellen asserts claims herein in his capacity as the brother of Matthew Charles Lewellen.

84.     Plaintiff Danielle Marie Lewellen is a citizen of the United States and resides in the city of Clarksville, Tennessee.  Plaintiff Danielle Marie Lewellen asserts claims herein in her capacity as the sister of Matthew Charles Lewellen.

85.     Plaintiff Renee Laque is a citizen of the United States and resides in the city of Nashville, Tennessee.  Plaintiff Renee Laque asserts claims herein in her capacity as the fiancee of Matthew Charles Lewellen.

86.     As a result of the attack, and the death of Matthew Charles Lewellen, Plaintiffs Charles Duwane Lewellen, Jr., Cynthia Marie Lewellen, James Andrew Lewellen, Danielle Marie Lewellen, and Renee Laque have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's/fiancee's society, companionship, comfort, advice, and counsel.

### 3.     Estate of Kevin Joseph McEnroe

87.     SSG McEnroe was born in 1986 in Englewood, Colorado.  He was a United States citizen at the time of his death and was domiciled in the State of Tennessee.

88.     After undertaking collegiate coursework at three colleges in Colorado and Arizona, SSG McEnroe enlisted in the United States Army on March 29, 2008, entering into active service on April 17, 2008.

89.     He completed Airborne School in 2008 and graduated from Special Forces training in 2011.

90.     SSG McEnroe was assigned to the U.S. Army's Fifth Special Forces Group based out of Fort Campbell, Kentucky.

91.     His role within his unit was as a Special Forces Communications Sergeant.

92.     SSG McEnroe had arrived in Jordan only days prior to the attack by Defendant Abu Tayeh.  He had been deployed to Jordan on one prior occasion in 2013 followed by deployments to Afghanistan and Lebanon in 2013, 2014, and 2015.

93.     At no point did SSG McEnroe pose any risk of harm to Defendant Abu Tayeh or the other Jordanian soldiers at the access control point.

94.     SSG McEnroe was an expert marksman and avid outdoorsman who was also part of a Special Forces dive team.

95.     He demonstrated a proclivity with languages, speaking Arabic and Russian and was a highly decorated and commended soldier.

96.     SSG McEnroe planned to move to Connecticut after his Jordanian deployment to get married to his fiancée Kimberly Argo and to return to college.

97.     SSG McEnroe was driving the second vehicle in the convoy when he sustained multiple gunshot wounds from Defendant Abu Tayeh.  According to the report issued by the United States Army regarding the assault, SSG McEnroe "was killed immediately by a gunshot wound" with the location where the fatal shot struck his body redacted.  As visible from the video

of the assault, SSG McEnroe had pressed the brake pedal in the vehicle he was driving, but after the shots were fired, the vehicle could be seen rolling forward indicating that his foot had come off the brake.

98.     Plaintiff Brian M. McEnroe is a citizen of the United States and resides in the city of Bradenton, Florida.   Plaintiff Brian M. McEnroe asserts claims herein as the Personal Representative of the Estate of Kevin Joseph McEnroe and in his capacity as the father of Kevin Joseph McEnroe.

99.     Plaintiff Linda L. Frost is a citizen of the United States and resides in the city of Tucson, Arizona. Plaintiff Linda L. Frost asserts claims herein in her capacity as the mother of Kevin Joseph McEnroe.

100.     Plaintiff Nicholas McEnroe is a citizen of the United States and resides in the city of Nashville, Tennessee.   Plaintiff Nicholas McEnroe asserts claims herein in his capacity as the brother of Kevin Joseph McEnroe.

101.     Plaintiff Christopher McEnroe is a citizen of the United States and resides in the city of Nashville, Tennessee.   Plaintiff Christopher McEnroe asserts claims herein in his capacity as the brother of Kevin Joseph McEnroe.

102.     Plaintiff Kimberly Argo is a citizen of the United States and resides in the city of Hamden, Connecticut.   Plaintiff Kimberly Argo asserts claims herein in her capacity as the fiancee of Kevin Joseph McEnroe.

103.     As a result of the attack, and the death of Kevin Joseph McEnroe, Plaintiffs Brian M. McEnroe, Linda L. Frost, Nicholas McEnroe, Christopher McEnroe, and Kimberly Argo have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's/fiancee's society, companionship, comfort, advice, and counsel.

### C.      Complicity in the Assault by Defendant Jordan

104.    Following the murder of the three SFOD-A members, Defendant Jordan initiated a false defense strategy that Defendant Abu Tayeh was justified within the rules of engagement in murdering SSG Lewellen, SSG McEnroe, and SSG Moriarty.

105.    Despite video evidence of the assault, the Jordanian state news agency Petra claimed that the "American military trainers had disobeyed direct orders from Jordanian troops, which led to a deadly exchange of small-arms fire."

106.    A statement issued by the Jordanian military shortly after the assault stated, "There was an exchange of fire at the entrance to the base after an attempt by the trainers' vehicle to enter the gate without heeding orders of the guards to stop."

107.    Jordanian officials also stated to media outlets that this was an "accidental" shooting despite video evidence that the assault was calculated to result in the death of these American soldiers.

108.    Jordanian officials also blamed the SFOD-A members that their alcohol consumption prior to arriving at the entry gate that precipitated the assault despite no evidence that they had been drinking.

109.    The story depicted by Defendant Jordan to defend Defendant Abu Tayeh's actions evolved over the months following the assault on the SFOD-A members.

110.    Defendant Jordan claimed that Defendant Abu Tayeh was acting within the rules of engagement because one of the Americans had accidentally discharged a firearm.

111.    The Jordanian narrative then changed to the concept that there was some loud noise in the vicinity of the access control point that justified Defendant Abu Tayeh's assault and murder of three American Special Forces soldiers.

112.    On March 6, 2017, the Jordanian Ambassador to the United States Dina Kawar wrote to Rep. Ted Poe (R-TX) in response to questions raised about the incident. Ambassador Kawar's letter stated:

> The incident was the result of implementation of military rules of engagement following hearing gunshot near the main entrance to the base and the subsequent belief of an ongoing attack. [Defendant Abu Tayeh] was tasked with swift response and accordingly fired towards the source of the sound in tandem with the passing of the vehicles of the US side coming from the shooting field and who, in turn, fired directly at [Defendant Abu Tayeh] believing he was targeting them. [Defendant] Abu Tayeh was badly wounded in the incident.
>
> The findings of the investigations and circumstances of the incident confirm absence of premeditated intentions by [Defendant Abu Tayeh] to target the friendly US side in light of a number of considerations: his 14 years of service, serving for more than 10 years in various military bases where the US side frequents; and on the day of the incident, seven vehicles for the US side emerged from the area Abu Tayeh was to guard without him targeting them despite having an M60 machine gun. It is noteworthy that the gun he used in the incident was M16 which he made ready upon hearing gun shots from outside as he was leaving his position at the base's gate to recharge his wireless device at the entrance.
>
> Against the backdrop of fire exchange, rules of engagement were applied by the swift response vehicle in the base to defend the latter without knowing that Americans were on the other side. The fire exchange was quickly halted upon knowing that friendly US members were on the other side….
>
> The incident was a tragic accident devoid of any terrorist or hostile motives or premeditated act towards the friendly US side. US forces have worked and trained in different military bases in Jordan without coming to any harm or attack throughout the past.

113.    Suggestions have been made that Ambassador Kawar's comments were made without having seen the video of the assault; however, the United States Army's investigation of the assault had been concluded by that time with its findings that there was no evidence that Defendant Abu Tayeh's actions were precipitated by a "loud noise" or shots fired in the vicinity of the access control point.

114.    As the video portrays, and as reported by the U.S. military in its investigation of the assault, none of the other Jordanian soldiers stationed at this gate took any action to bring the

assault to a conclusion.  This failure to act by anyone in the Jordanian military posted at the gate that day supports the suspicion that these other soldiers were complicit in Defendant Abu Tayeh's actions through the Jordanian chain of command.

115.    As noted in the U.S. Army's investigation, Jordanian soldiers prevented the convoy of SFOD-A members that was arriving at the access control point after the assault began to assist those who were in the line of fire from Defendant Abu Tayeh.

116.    Upon information and belief, Defendant Abu Tayeh's mother claims that Defendant Jordan gave Defendant Abu Tayeh a promotion and a medal following his murder of the three SFOD-A members.  In short, Defendant Jordan rewarded Defendant Abu Tayeh for murdering three American soldiers in cold blood.

117.    By continuing to defend the actions of Defendant Abu Tayeh, Defendant Jordan was complicit in his act of terrorism.  Video of the assault removed any doubt from anyone who has viewed it that this assault was not "accidental" nor was it within the rules of engagement.

118.    By virtue of its statements through March 2017, Defendant Jordan ratified the actions of Defendant Abu Tayeh despite clear video evidence of the falsity of the claims being espoused.

## C.    Waiver of Sovereign Immunity by Jordan

119.    According to diplomatic agreements between the United States and Defendant Jordan, U.S. military personnel acting in accordance with their official military duties are "accorded the same status as that provided to the technical and administrative staff of the United States Embassy and that they may enter and exit Jordan with United States Government identification and with collective or individual travel orders" while present in Jordan.  *See* U.S. Embassy Note No. 261 (April 4, 1996); accepted by Jordan via MK/3/Z1/366 (April 10, 1996).

120.    The Vienna Convention on Diplomatic Relations, 500 U.N.T.S. 95, entered into force on 24 April 1964, provides that "technical and administrative staff" are "members of the mission."  Vienna Convention, art. 1(b); *see also* art. 1(c) and 1(f).

121.    Article 37.2 of the Vienna Convention, referring back to Article 29, provides that the persons of "members of the mission" such as the three Americans killed on November 4, 2016 "shall be inviolable….   The receiving State shall treat [them] with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity."  Vienna Convention, art. 29.

122.    Furthermore, "the receiving State shall ensure to all members of the mission freedom of movement and travel in its territory."  Vienna Convention, art. 26.

123.    Both the United States and Jordan are parties to the Vienna Convention.

124.    Under the terms of the bilateral agreement between the United States and Jordan, the three murdered SFOD-A members were entitled to "due respect" as "members of the mission" thus creating a duty on the part of Defendant Jordan to "take all appropriate steps to prevent any attack on his person, freedom or dignity" under the admonition of customary international law.

125.    Not only did Defendant Jordan fail to prevent an attack on the persons of the three SFOD-A members, but Defendant Jordan defended the right of its agent, Defendant Abu Tayeh, to murder SSG McEnroe, SSG Lewellen, and SSG Moriarty.

126.    By freely undertaking the obligation to accord diplomatic treatment to the members of the United States military operating in Jordan, Defendant Jordan implicitly waived its right to assert sovereign immunity when individuals within the Jordanian chain of command engaged in a deliberate attack resulting in the death of three Americans who were entitled to diplomatic protection by Defendant Jordan.

127.     To permit Defendant Jordan to claim sovereign immunity would reward Defendant Jordan for its role in the murder of the three SFOD-A members in violation of international law.

**D.     Applicability of JASTA**

128.     On September 28, 2016, the Justice Against Sponsors of Terrorism Act ("JASTA") was enacted by a Congressional vote overriding the veto of President Barack Obama.  *See* Pub. L. 114-222, 130 Stat. 852 (Sept. 28, 2016).

129.     The purpose of JASTA was set forth in the statutory language: "The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b).

130.     Cases seeking to apply the non-commercial tort exception to foreign sovereign immunity, 28 U.S.C. § 1605(a)(5), strictly interpret the scope of the tort taking place within the 50 United States based on the primary purpose of 28 U.S.C. § 1605(a)(5) "to eliminate a foreign state's immunity for traffic accidents and other torts committed in the United States, for which liability is imposed under domestic tort law."  *Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439-40 (1989).

131.     The scope of JASTA is not so similarly circumscribed as set forth in the statement of its purpose to provide the broadest possible basis to American civil litigants to pursue terrorism-related claims.

132.    King Faisal Air Base was the base of operations for the SFOD-A in Jordan with significant resources available to the American military including medical facilities, meal facilities, housing, and so forth.

133.    It was standard operating procedure not to stop American vehicles when they would enter the base at the access control point.

134.    Furthermore, according to diplomatic agreements between the United States and Defendant Jordan, U.S. military personnel were the equivalent of consular staff with their operations on the air base constituting a consular presence

135.    As designated members of the mission of the U.S. Embassy in Amman congregated in defined quarters at King Faisal Air Base, Plaintiffs submit that upon information and belief, the Air Base constituted sovereign United States territory.

136.    Plaintiffs submit that, based on the status of the King Faisal Air Base housing U.S. Embassy mission staff, the attack perpetrated by Defendant Abu Tayeh on the SFOD-A members constituted an act of international terrorism in the United States.

137.    The assault by Defendant Abu Tayeh that resulted in the deaths of three American servicemen accorded diplomatic status in Jordan further constitutes a severe breach of the Vienna Convention by Defendant Jordan through the murder of three individuals whose persons were inviolable under the Vienna Convention and the diplomatic arrangements between the United States and Jordan.

138.    Jordan cannot claim a violation of its sovereignty by being subject to this suit where its agent blatantly violated the sovereignty of the United States and its diplomatic personnel when it permitted Defendant Abu Tayeh to murder three individuals accorded diplomatic protection and then attempted to cover this fact up for months thereafter.

139.     JASTA, by its terms, requires "(1) an act of international terrorism in the United States; and (2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred." 28 U.S.C. § 1605B(b).

140.     Defendant Abu Tayeh's actions in murdering SSG Moriarty, SSG Lewellen, and SSG McEnroe involved violent acts that were dangerous to human life in violation of the criminal laws of the United States and in violation of the criminal laws of Jordan when they were committed.  Defendant Abu Tayeh was tried and convicted in Jordan of crimes related to the murders and is serving a life sentence with hard labor according to his sentencing.

141.     By targeting American soldiers, Defendant Abu Tayeh appeared to intend to affect the conduct of the United States government through assassination of SSG Moriarty, SSG Lewellen, and SSG McEnroe.

142.     The acts giving rise to this case occurred primarily outside the territorial jurisdiction of the United or transcended national boundaries between the United States and Jordan in terms of the American consular territory at King Faisal Air Base near Al-Jafr, Jordan.

143.     The acts of Defendant Abu Tayeh were not mere negligence but rather an intentional act of murder.

## COUNT I

## INJURY BY REASON OF AN ACT OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2333(a)

### (As to Defendant Abu Tayeh)

144.    Plaintiffs incorporate all previous allegations by reference.

145.    All of the Plaintiffs are United States nationals who were injured by reason of the murder committed against SSG Moriarty, SSG Lewellen, and SSG McEnroe as an act of international terrorism.

146.    Defendant Abu Tayeh's actions were in violation of American and Jordanian law and constituted violent acts dangerous to human life.

147.    Defendant Abu Tayeh's apparent intention was to target American nationals to affect the conduct of the American government by means of assassination.

148.    Defendant Abu Tayeh's actions transcended national boundaries by singling out American nationals while in Jordan.

**WHEREFORE**, plaintiffs demand judgment against Defendant Abu Tayeh for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT II

## AIDING AND ABETTING AND DEFENDANT ABU TAYEH TO COMMIT AN ACT OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2333(d)

### (As to Defendant Jordan)

149.    Plaintiffs incorporate all previous allegations by reference.

150.    As set forth above, Defendant Jordan knowingly provided Defendant Abu Tayeh with safe harbor and substantial assistance in the form of international denials of culpability on the part of Defendant Abu Tayeh who carried out an act of international terrorism – as Defendant Jordan's agent and member of the Jordanian military – against Plaintiffs.

151.    Plaintiffs' claims against Defendant Jordan relate to its tortious acts in support of Defendant Abu Tayeh and fall within the exception to foreign sovereign immunity set forth at 28 U.S.C. § 1605B, and plaintiffs are thus authorized to assert causes of action against the Hashemite Kingdom of Jordan pursuant to the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*

152.    Defendant Jordan aided and abetted Defendant Abu Tayeh in carrying out an act of international terrorism against the United States and its citizens on November 4, 2016, in violation of 18 U.S.C. § 2333(d).

153.    At the time of the November 4, 2016 attack, Defendant Abu Tayeh was, upon information and belief, acting on behalf of the Islamic State a/k/a "ISIS", a designated foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189).

154.    The safe harbor and propaganda support provided by Defendant Jordan to Defendant Abu Tayeh, as described above, enabled the murder of three American citizens and further damage to their families through the consistent blame placed on the Americans who were killed for what transpired.

155.    Plaintiffs suffered injuries to their persons by reason of the November 4, 2016 act of international terrorism.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Jordan for an amount authorized by governing law to be determined at trial, together with treble damages, punitive

damages, pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT III

### AIDING AND ABETTING AND CONSPIRING WITH DEFENDANT ABU TAYEH TO COMMIT AN ACT OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2333(a)

### (As to Defendant Jordan)

156.    Plaintiffs incorporate all previous allegations by reference.

157.    As enacted in 1992, the express civil cause of action established under 18 U.S.C. § 2333(a) authorized claims for aiding and abetting and conspiring to commit an act of international terrorism.

158.    Through the tortious acts in support of Defendant Abu Tayeh described above, Defendant Jordan aided and abetted, and conspired with, Defendant Abu Tayeh to carry out the act of international terrorism on November 4, 2016, in violation of 18 U.S.C. § 2333(a).

159.    The attack that Defendant Jordan attempted to blame on the Plaintiffs involved acts of violence and acts dangerous to human life in violation of the criminal laws of the United States. *See* 18 U.S.C. § 2332a(a)(1) (use of a weapon of mass destruction (M-16) against nationals of the United States).

160.    Plaintiffs suffered injuries by reason of acts committed by Defendant Abu Tayeh that involved the murder and attempted murder of persons the United States in violation of the criminal laws of the United States, including the prohibitions set forth in 18 U.S.C. § 2332.

161.    Through the tortious acts in support of Defendant Abu Tayeh described above, Defendant Jordan aided and abetted Defendant Abu Tayeh in carrying out an act of international terrorism against the United States on November 4, 2016, in violation of 18 U.S.C. §§ 2332(a), 2332(b), 2332(c), and 2333.

162.    Defendant Jordan knew at all times that Defendant Abu Tayeh had committed an act of international terrorism and substantially assisted this act of international terrorism by attempting to cover it up and/or blame the Plaintiffs for the attack.

163.    By aiding and abetting violations of 18 U.S.C. § 2332 that have caused injuries to plaintiffs, Defendant Jordan is liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs have sustained as a result of such injuries.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Jordan for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT IV

## WRONGFUL DEATH

## (As to All Defendants)

164.    Plaintiffs incorporate all previous allegations by reference.

165.    Plaintiffs herein bring this action for the wrongful death proximately caused by Defendants Abu Tayeh and Jordan for the attack that took place on November 4, 2016.

166.    Defendant Jordan is not entitled to sovereign immunity by virtue of having waived sovereign immunity under 28 U.S.C. § 1605(a)(1).  The exception to sovereign immunity contained in 28 U.S.C. § 1605B also precludes Defendant Jordan from asserting sovereign immunity here.

167.    Surviving family members or estates of those wrongfully killed are entitled to recover damages from Defendants Abu Tayeh and Jordan for these illegal and wrongful deaths. The family members or estates are entitled to recover full damages incurred, as fair and just

28

compensation for the injuries resulting from these wrongful deaths.  Those responsible for these deaths must be held accountable for the losses incurred.

168.     The injuries and damages suffered by plaintiffs were proximately caused by the intentional, malicious, reckless, criminal, violent, grossly negligent or negligent acts of Defendants Abu Tayeh and Jordan as described herein.

169.     As a direct and proximate result of the wrongful deaths of the decedents, their heirs and families have suffered financially and been deprived of all future aid, income, assistance, services, comfort, companionship, affection and financial support of their loved ones.

170.     As a direct and proximate result of the Defendants' acts of international terrorism, torture, conspiracy, and racketeering resulting in the wrongful death of decedents, the heirs and families of those murdered suffer and will continue to suffer permanent, physical and emotional distress, severe trauma, and lasting physical, emotional, and psychological injuries.

**WHEREFORE**, Plaintiffs demand judgment against Defendants Abu Tayeh and Jordan for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT V

## SURVIVAL

### (As to All Defendants)

171.     Plaintiffs incorporate all previous allegations by reference.

172.     Defendant Jordan is not entitled to sovereign immunity by virtue of having waived sovereign immunity under 28 U.S.C. § 1605(a)(1).   The exception to sovereign immunity

contained in 28 U.S.C. § 1605B also precludes Defendant Jordan from asserting sovereign immunity here.

173.    As a result of the intentional, malicious, reckless, criminal, unprivileged, nonconsensual, grossly negligent and negligent acts of Defendants Abu Tayeh and Jordan as described herein, James Francis Moriarty, Matthew Charles Lewellen, and Kevin Joseph McEnroe were placed in a severe, often prolonged, extreme, traumatic, apprehension of harmful, offensive unwarranted bodily contact, injury and assault.  Those murdered suffered intensely severe and offensive harmful bodily contact, personal injury and battery; including but not limited to extreme fear, terror, anxiety, emotional and psychological distress, knowledge of pending death and physical and emotional trauma, and intentionally inflicted physical pain.  Decedents were mentally, physically and emotionally damaged, harmed, trapped, and falsely imprisoned prior to their personal physical injury and deaths.

174.    As a result of Defendants' criminal and tortious conduct, those killed suffered damages including pain and suffering, severe trauma, fear, anxiety, permanent physical and emotional distress, ultimate loss of life and life's pleasures, companionship and consortium, loss of family, career, earnings and earning capacity, loss of accretion to their estates, and other immeasurable items of damages to be shown at trial.  Plaintiffs herein seek and are entitled to survival damages for those tortured and killed on November 4, 2016.

**WHEREFORE**, Plaintiffs demand judgment against Defendants Abu Tayeh and Jordan for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT VI

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (As to All Defendants on behalf of All Individual Plaintiffs)

175.   Plaintiffs incorporate all previous allegations by reference.

176.   Defendant Jordan is not entitled to sovereign immunity by virtue of having waived sovereign immunity under 28 U.S.C. § 1605(a)(1).   The exception to sovereign immunity contained in 28 U.S.C. § 1605B also precludes Defendant Jordan from asserting sovereign immunity here.

177.   Defendant Abu Tayeh intended or knew or should have known, that his conduct and actions would lead to the killing of or injury to innocent persons and resulting severe emotional distress.

178.   Defendant Jordan intended, knew or should have known that its actions aiding and abetting Defendant Abu Tayeh by shifting the blame for the November 4, 2016 attack to those who were murdered would leave devastated family members to grieve for their losses with ongoing physical, psychological and emotional injuries.

179.   The actions of Defendant Jordan were unconscionable, extreme, outrageous, and done with an intentional, malicious, and willful disregard for the rights and lives of those murdered and their surviving loved ones.

180.   As a direct and proximate cause of the Defendants' intentional misconduct and reckless disregard for human life, Plaintiffs have suffered and will forever continue to suffer severe, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counselling.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Abu Tayeh and Defendant Jordan for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT VII

## VIOLATIONS OF INTERNATIONAL LAW

### (As to All Defendants)

181.    Plaintiffs incorporate all previous allegations by reference.

182.    Defendant Jordan is liable for plaintiffs' injuries under the principles of international law.

183.    Defendant Jordan is not entitled to sovereign immunity by virtue of having waived sovereign immunity under 28 U.S.C. § 1605(a)(1).   The exception to sovereign immunity contained in 28 U.S.C. § 1605B also precludes Defendant Jordan from asserting sovereign immunity here.

184.    It is long settled that the law of nations is part of federal common law, and that federal courts are empowered to address claims against those that commit, aid, or abet violations of international law.

185.    The November 4, 2016 assault on King Faisal Air Base involved the violation of the Vienna Convention on Diplomatic Relations, 500 U.N.T.S. 95, by failing to protect the inviolability of the person of members of the diplomatic mission.

186.    The following international treaties, *inter alia*, address the right not to be murdered in an extrajudicial manner under color of law and/or protect the lives of diplomatic or consular personnel:

    a.   Vienna Convention on Diplomatic Relations, art. 37.2;

    b.   Vienna Convention on Consular Relations, art. 40;

    c.   Universal Declaration of Human Rights, arts. 3 and 5;

    d.   International Covenant on Civil and Political Rights, arts. 6.1 and 7; and

    e.   Convention Against Torture, arts. 1 and 2.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Abu Tayeh and Defendant Jordan for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT VIII

## VIOLATIONS OF THE TORTURE VICTIM PROTECTION ACT OF 1991

### (As to Defendant Abu Tayeh)

187.    Plaintiffs incorporate all previous allegations by reference.

188.    The Torture Victim Protection Act, Pub. L. 102-256, 106 Stat. 734 (Mar. 12, 1992), provides a cause of action to a decedent's representative, or to any person who may be a claimant in an action for wrongful death, for "extrajudicial killing" perpetrated by any individual acting under the actual or apparent authority or color of law of any foreign nation.

189.    Defendant Abu Tayeh, acting under color of law as supported by Defendant Jordan from November 4, 2016 through April 2017, engaged in acts of extrajudicial killing of James Francis Moriarty, Matthew Charles Lewellen, and Kevin Joseph McEnroe on November 4, 2016.

190.    The murders were deliberate and were not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

191.   Because the claims set forth herein include claims against the Hashemite Kingdom of Jordan, Plaintiffs submit that seeking adequate and available remedies within the Hashemite Kingdom of Jordan would be futile under the circumstances.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Abu Tayeh and Defendant Jordan for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand:

(a)   Accept jurisdiction over this action;

(b)   Trial by jury;

(c)   Judgment for all Plaintiffs against Defendants for compensatory damages, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses, and loss of solatium, in amounts to be determined at trial;

(d)   Judgment for all Plaintiff Estates against Defendants for compensatory damages for wrongful death, including but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses, and any pecuniary loss (or loss of income to the estates) in amounts to be determined at trial;

(e)   Judgment for all Plaintiffs against Defendants for punitive damages in an amount to be determined at trial;

(f)   Enter judgment against Defendants and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

(g)     Enter judgment against Defendants and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorney's fees, pursuant to 18 U.S.C. § 2333(a);

(h)     Enter an Order declaring that Defendants have violated the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*; and

(i)     Grant such other and further relief as justice requires.

Dated:  November 16, 2018
        Washington, DC

Respectfully submitted,

MOTLEY RICE LLC

_____
Robert T. Haefele, Esq. (Bar ID No. 1007583)
John M. Eubanks, Esq.
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000
Fax: (843) 216-9450
E-mail: rhaefele@motleyrice.com