# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES R. MORIARTY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:18-cv-02649-CKK |
| ) | |
| THE HASHEMITE KINGDOM OF JORDAN, ) | |
| et al. ) | |
| ) | |
| Defendants. ) | |
| ) | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION TO DISMISS BY THE HASHEMITE KINGDOM OF JORDAN

**MOTLEY RICE LLC**

Robert T. Haefele (D.C. Bar No. 1007583)
John M. Eubanks (admitted *pro hac vice*)
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
(843) 216-9000
RHaefele@motleyrice.com
JEubanks@motleyrice.com

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

**Page(s)**

**INTRODUCTION** ................................................................................................................... 1

**POINTS AND AUTHORITIES** ............................................................................................. 2

**I.    The Status of Forces Agreement Between the United States and Jordan Creates a Waiver of Sovereign Immunity** ....................................................................................... 2

    **A.    "Implied Waiver" Under 28 U.S.C. § 1605(a)(1)** ................................................ 2

    **B.    The Status of Forces Agreement Between the United States and Jordan** ....... 4

**II.   In the Alternative, the Court Should Grant Limited Jurisdictional Discovery** .......... 8

**CONCLUSION** ....................................................................................................................... 10

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) .......................................... 4

*Base Metal Trading Ltd. v. Russian Aluminum*, 98 Fed. App'x 47 (2d Cir. 2004) ........................ 8

*Creighton, Ltd. v. Government of the State of Qatar*, 181 F.3d 118 (D.C. Cir. 1999) ................... 3

\* *Crist v. Rep. of Turkey*, 995 F. Supp. 5 (D.D.C. 1998) ............................................................... 10

\* *Factor v. Laubenheimer*, 290 U.S. 276 (1933) .............................................................................. 9

*Freeman v. Quicken Loans, Inc.*, 566 U.S. 624 (2012) .................................................................. 7

*Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142 (2d Cir. 2000) .......................................... 8

*Gutch v. Fed. Rep. of Germany*, 444 F. Supp. 2d 1 (D.D.C. 2006) ................................................ 7

*In re Papandreau*, 139 F.3d 247 (D.C. Cir. 1998) ....................................................................... 10

*Intelsat Global Sales & Mktg. v. Cmty. of Yugoslav Posts Telegraphs and Telephones*, 534 F. Supp. 2d 32 (D.D.C. 2008) ....................................................................................... 10

\* *Owens v. Rep. of Sudan*, 374 F. Supp. 2d 1 (D.D.C. 2005) ....................................................... 10

*Phoenix Consulting, Inc. v. Rep. of Angola*, 216 F.3d 36 (D.C. Cir. 2000) .................................. 10

*Polak v. Int'l Monetary Fund*, 657 F. Supp. 2d 116 (D.D.C. 2009) ............................................. 10

*Princz v. Fed. Rep. of Germany*, 26 F.3d 1166 (D.C. Cir. 1994) ............................................... 3, 4

*Shapiro v. Rep. of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991) .................................................... 3

\* *Strange v. Islamic Republic of Iran*, 320 F. Supp. 3d 92 (D.C.D. 2018) ................................. 6, 7

*Travel Assocs., Inc. v. Kingdom of Swaziland*, 1990 U.S. Dist. LEXIS 11455 (D.D.C. Aug. 29, 1999) ................................................................................................................................ 6

*United States v. Ali*, 718 F.3d 929 (D.C. Cir. 2013) ...................................................................... 7

*World Wide Minerals, LTD. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002) ........ 3, 4

**Statutes**

28 U.S.C. § 1605(a)(1) ................................................................................................................ 2, 3

Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* ................................................ 2, 3, 7

**Other Authorities**

H.R. Rep. No. 1487, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S. Code Cong. & Admin.
    News 6604 ................................................................................................................... 3

\* *Restatement (Third) of the Foreign Relations Law of the United States* § 325, cmt. g ............... 9

\* Vienna Convention on Diplomatic Relations, 500 U.N.T.S. 95, entered into force on 24 April
    1964 ....................................................................................................... 2, 4, 5, 6

**INTRODUCTION**

Plaintiffs respectfully submit this memorandum of points and authorities in opposition to the motion to dismiss filed by Defendant The Hashemite Kingdom of Jordan ("Jordan"). While offering hollow condolences regarding the murder of James "Jimmy" Moriarty, Matthew Lewellen, and Kevin McEnroe, Jordan asserts that it played no role in legitimizing and endorsing the acts of its soldier who murdered these American Green Berets on November 4, 2016. In furtherance of this approach, Jordan asserts sovereign immunity for the murder of these three Americans on Jordanian soil who were not engaged in hostilities against their Jordanian hosts.

The facts of what happened on November 4, 2016 are not subject to dispute—partially as a result of security-camera footage that captured the majority of the engagement between the Jordanian soldier and the Americans as they attempted to enter the Jordanian air base near Al-Jafr, Jordan. From a factual perspective, Jordan failed to act in a timely manner to prosecute the individual who carried out the murders—instead, ratifying the acts by defending him vigorously in the media, in military circles, and through the possible promotion of the shooter after the shooting. *See, e.g.,* FAC at ¶¶ 104-05, 109-11, 115-16. While ratifying the actions of its murderous soldier, Jordan engaged in a campaign to slander the American soldiers stating they refused to follow orders at the gate, were inebriated, and had initiated the firefight—all positions visibly contradicted by the video of the attack. *See, e.g., id.* at ¶¶ 104-05, 107, 109, 111.

Notwithstanding these indisputable facts, Jordan believes that principles of sovereign immunity shield it from any liability for its role under a *respondeat superior* theory for the actions of its employee/agent, the shooter, that were ratified by Jordan until doing so was no longer politically expedient. The political expediency was required following the issuance of a February 16, 2017 report by the United States Special Operations Command including numerous "Findings

and Recommendations" regarding the incident that were contrary to Jordan's official position vis-à-vis the murder of these three American soldiers.[1] Only after this report was made public (in March 2017) did Jordan engage in a prosecution of the shooter for the benefit of the American government and ostensibly for the benefit of the plaintiffs in this case.  The fact remains that the ratified actions of the shooter violated the Status of Forces Agreement in place between Jordan and the United States which dictated the inviolability of U.S. soldiers stationed in Jordan.  Jordan makes a red-herring argument that the Vienna Convention on Diplomatic Relations ("Vienna Convention"), 500 U.N.T.S. 95, entered into force on 24 April 1964, cannot provide a basis for the waiver of sovereign immunity pursuant to 28 U.S.C. § 1605(a)(1); however, the Vienna Convention only dictates the rules to which Jordan acceded in entering the Status of Forces Agreement with the United States.  Jordan's reading of the Status of Forces Agreement as not constituting a waiver of immunity should the provisions of the Agreement be violated would render the Status of Forces Agreement an empty letter—devoid of meaning.

## POINTS AND AUTHORITIES

I.   **The Status of Forces Agreement Between the United States and Jordan Creates a Waiver of Sovereign Immunity**

   A.   **"Implied Waiver" Under 28 U.S.C. § 1605(a)(1)**

Plaintiffs agree with Defendant Jordan's recitation of the law as it pertains to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, being the exclusive basis for jurisdiction over a foreign sovereign, that foreign sovereigns are presumptively immune from jurisdiction in U.S. courts subject to enumerated exceptions, that Plaintiffs bear the burden of

---

[1] *See* USSOCOM Jordan 15-6 For Public Release (Redacted) Final – 7 MAR 17.pdf, located at https://www.socom.mil/FOIA/Documents/USSOCOM%20Jordan%2015-6%20%20For%20Public%20Release%20(Redacted)%20Final%20-%207%20MAR%2017.pdf (last accessed on April 19, 2019).

alleging sufficient facts to satisfy specific exceptions to sovereign immunity, that Plaintiffs' factual allegations should be taken as true for the purposes of a strictly legal challenge on jurisdiction, and courts may consider documents specifically referenced and integrated into Plaintiffs' pleading without converting the motion into one for summary judgment. *See* ECF No. 11-1 at 1-2. Plaintiffs assert jurisdiction only under the 28 U.S.C. § 1605(a)(1) which states, "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case – (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver…."

While the term "implied waiver" is not defined, the D.C. Circuit has "followed the 'virtually unanimous' precedents construing the implied waiver provision narrowly." *See World Wide Minerals, LTD. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 n.11 (D.C. Cir. 2002) (quoting *Creighton, Ltd. v. Government of the State of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999)). The D.C. Circuit also requires a showing of intent on the part of the foreign sovereign to waive sovereign immunity. *See Creighton, Ltd.*, 181 F.3d at 122 (citing *Princz v. Fed. Rep. of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994)). The D.C. Circuit has generally looked at the House Report on the waiver provision of the FSIA for examples of what type of activity constitutes an implied waiver. These examples include "where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract. An implicit waiver would also include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity." *See Shapiro v. Rep. of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991) (quoting H.R. Rep. No. 1487, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S. Code Cong. & Admin. News 6604, 6617). The D.C. Circuit has "been

reluctant to stray beyond these examples when considering claims that a nation has implicitly waived its defense of sovereign immunity." *World Wide Minerals, LTD.*, 296 F.3d at 1161 n. 11 (quoting *Princz*, 26 F.3d at 1174).   Contrary to Jordan's position, however, reluctance does not bar an expansion of implied waiver availability where necessary.

Jordan conclusively states that Plaintiffs' failure to state their waiver argument in terms of the examples above should result in dismissal of Plaintiffs' First Amended Complaint; however, Jordan's passing reference to the Status of Forces Agreement between the United States and Jordan and to inapposite authority related to the Vienna Convention and a status of forces agreement in another case do not dictate Jordan's intended result.

### B.    The Status of Forces Agreement Between the United States and Jordan

Jordan fails to quote from the actual Status of Forces Agreement (the "Agreement") in making its argument that it cannot provide the basis for a waiver of Jordan's sovereign immunity. The Agreement makes reference to prior discussions between the two governments "regarding the status of United States military personnel and civilian employees of the Department of Defense who may be in Jordan temporarily in connection with their official duties." *See* Declaration of John M. Eubanks ("Eubanks Dec."), Ex. A at 1.[2]  The decedents in this case were United States military personnel in Jordan temporarily in connection with their official duties.  *See* FAC ¶¶ 1-2, 13-18.  The Agreement "proposes that such personnel be accorded the same status as that provided to the technical and administrative staff of the United States Embassy in Jordan…." *See* Eubanks Dec., Ex. A at 1.  The Jordanian Ministry of Foreign Affairs officially accepted the proposal

---

[2] The documents attached to the Eubanks Declaration are both incorporated by reference in Plaintiffs' First Amended Complaint.  *See, e.g.,* FAC ¶ 118.  "A district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015).

4

contained in the American diplomatic note thus establishing the Status of Forces Agreement.  *See* Eubanks Dec., Ex. B.

The phrase "technical and administrative staff of the United States Embassy" used in the Agreement connotes a term of art.  The status accorded to "technical and administrative staff of the United States Embassy" is set forth in the Vienna Convention.  As set forth in Plaintiffs' First Amended Complaint, the Vienna Convention provides that "technical and administrative staff" are "members of the mission."  Vienna Convention, art. 1(b); *see also* art. 1(c) and 1(f).  Article 37.2 of the Vienna Convention, referring back to Article 29, provides that the persons of "members of the mission" such as the three Americans killed on November 4, 2016 "shall be inviolable…. The receiving State shall treat [them] with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity."  Vienna Convention, art. 29.  Further, "the receiving State shall ensure to all members of the mission freedom of movement and travel in its territory." Vienna Convention, art. 26.  *See* FAC ¶¶ 118-26.

Both the United States and Jordan are parties to the Vienna Convention making the incorporation in the Agreement of terminology from the Vienna Convention determinative. Under the terms of the bilateral agreement between the United States and Jordan, the three murdered Americans were entitled to "due respect" as "members of the mission" thus creating a duty on the part of Jordan to "take all appropriate steps to prevent any attack on [their] person, freedom or dignity" under the admonition of customary international law.

At no point have Plaintiffs argued that the Vienna Convention, as an international agreement, waives Jordan's sovereign immunity.  *See* ECF No. 11-1 at 6.  Instead, the Vienna Convention provides the definitional context for terms used in the Agreement regarding the treatment to be afforded the "technical and administrative staff of the United States Embassy in

5

Jordan." Violation of the Vienna Convention in the manner alleged by the Plaintiffs therefore constitutes a violation of the Agreement—a bilateral agreement between the United States and Jordan. The Agreement differs in substantial respect to the Vienna Convention: (1) it is a bilateral agreement between two countries; (2) it sets forth how Jordan is to treat United States military personnel in Jordan in connection with their official duties; and (3) it defines the status of these individuals in Jordan. The breach at issue in this case is not a breach of the Vienna Convention. It is a breach of the Agreement between the United States and Jordan resulting in the death of three American soldiers who held diplomatic status in Jordan at the time of their murder by a member of the Jordanian military.

The cases cited by Jordan regarding the Vienna Convention and status of forces agreements generally are inapposite to the factual scenario before the Court. In *Travel Assocs., Inc. v. Kingdom of Swaziland*, 1990 U.S. Dist. LEXIS 11455 (D.D.C. Aug. 29, 1999), plaintiffs sought waiver of sovereign immunity invoking *solely* the Vienna Convention as an international agreement that did not explicitly provide a waiver. Here, Plaintiffs do not rely on the Vienna Convention as providing waiver authority. While Plaintiffs assert that Jordan violated the status afforded to the three Americans by virtue of the Vienna Convention, the actual breach at issue here is not of the Vienna Convention but rather of the Agreement.

Further, in *Strange v. Islamic Republic of Iran*, 320 F. Supp. 3d 92 (D.C.D. 2018), this Court addressed the applicability of a provision of the Security and Defense Cooperation Agreement ("SDCA") between Afghanistan and the United States to determine whether a waiver of sovereign immunity was evinced by the language of the agreement. In the particular agreement at issue in that case, this Court determined it "has nothing to do with suits brought against Afghanistan. It only addresses claims that are brought against 'United States forces.'" 320 F.

Supp. 3d at 99.³ In other words, the SDCA was silent on obligations of Afghanistan to Americans in Afghanistan and focused on the conduct of United States forces against Afghan nationals. The Agreement in this case makes no mention of the conduct of United States forces against Jordanian nationals. It is concerned solely with the "status of United States military personnel and civilian employees of the Department of Defense who may be in Jordan temporarily in connection with their official duties." *See* Eubanks Dec., Ex. A at 1. The American soldiers were murdered by a member of the Jordanian military who Jordan claimed for months was acting in accord with the rules of engagement knowing this contention to be false. The safety and protection of American soldiers in Jordan was (and remains) the primary focus of the Agreement, yet Jordan seeks to render such a breach not actionable seeking to hide behind the shield of sovereign immunity.

In interpreting statutes, treaties, and international agreements, the D.C. Circuit has adopted the "canon against surplusage" that "favors that interpretation which *avoids* surplusage." *See United States v. Ali*, 718 F.3d 929, 937 (D.C. Cir. 2013) (quoting *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012)). The Agreement imposes a duty upon Jordan to provide for the safety and protection of American soldiers in Jordan in connection with their official duties. However, the imposition of such a duty without a corresponding remedy would render the Agreement meaningless. The only interpretation that provides actual meaning, or "teeth", to the Agreement is the implicit recognition by Jordan that a remedy would exist where the diplomatic status of U.S.

---

³ The citation to *Gutch v. Fed. Rep. of Germany*, 444 F. Supp. 2d 1 (D.D.C. 2006), also misses the mark in addressing the NATO-SOFA in a *pro se* case in which the claims had already been adjudicated to the highest level in Germany prior to being brought in the United States. Furthermore, the plaintiff in *Gutch* argued that "international agreements" in existence when the FSIA was passed in 1976 governed the adjudication of the case. While an argument was also made regarding waiver, any reference to the NATO-SOFA was in regard to an existing international agreement that was required to be in "express conflict" with the FSIA to permit jurisdiction over the foreign sovereign.

military personnel in Jordan was violated. Given that the Agreement only discusses duties that Jordan assumed as to the U.S. military personnel (and not the reciprocal duties owed by the U.S. military personnel), the existence of a remedy in the United States through a waiver would be clear. The converse situation is what was present in the *Strange* case in which the agreement at issue only addressed claims against the United States and did not have reciprocal language regarding Afghan duties.[4]

For the foregoing reasons, Plaintiffs respectfully submit that Jordan has waived its sovereign immunity as it relates to breaches of the Agreement and more specifically to the murder of James Moriarty, Matthew Lewellen, and Kevin McEnroe.

## II. In the Alternative, the Court Should Grant Limited Jurisdictional Discovery

While Plaintiffs submit that Jordan has waived its sovereign immunity through its breach of the Agreement, in the alternative, limited jurisdictional discovery may assist the Court in

---

[4] The suggestion that Plaintiffs could have sought compensation in the Jordanian courts relating to the murder of three Americans by a member of the Jordanian military allegedly acting under rules of engagement is fantastical. *See* ECF No. 11-1 at 7. As the Second Circuit held in *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 147 (2d Cir. 2000), victims or their family members of "a murderous act directed specifically against foreigners" would be "strongly adverse to litigating in a country where foreigners have been the target of hostile attacks, and have concerns for their own safety if required to travel there to bring their suit." Therefore, the Second Circuit denied a *forum non conveniens* challenge to proceeding in an American court versus a foreign court where the tragedy took place. The same is true here. While some of the Plaintiffs here traveled to Jordan to attend the criminal proceedings against the shooter, it would be a significant logical leap to contend they would be comfortable litigating as a party in Jordan. Furthermore, the tribe to which the shooter belonged has engaged in systematic protests in Jordan against the shooter's conviction which pose a threat to the security of the families as well. In fact, the families requested to travel to site of the attack following the announcement of the verdict, and they were informed by members of the U.S. Departments of State and Defense that this posed too great a security and safety risk to the families to permit them to travel to Al-Jafr due to the unrest created by the announcement of the verdict. In determining the viability of an alternative forum, the Second Circuit has also raised the question of "Can the plaintiff litigate his claims safely and with peace of mind (i.e., free from threats of violence and/or trauma connected with the particular claims)?" *See Base Metal Trading Ltd. v. Russian Aluminum*, 98 Fed. App'x 47, 50 (2d Cir. 2004). Here, the clear answer would be a resounding "no."

making a determination regarding its jurisdiction in this case. The *Restatement (Third) of the Foreign Relations Law of the United States* § 325 indicates that "courts in the United States are generally more willing than those of other states to look outside the instrument to determine its meaning." *Restatement (Third) of the Foreign Relations Law of the United States* § 325, cmt. g. As the Supreme Court has stated:

> In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred.

*Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933). Here, the parties hold conflicting interpretations of the Agreement and its impact on the sovereign immunity asserted by Jordan.

Plaintiffs respectfully submit that the perspectives of the United States and Jordan through the negotiation process may provide more light on the intent by Jordan to waive its immunity where the diplomatic status of U.S. military personnel in Jordan is violated and the availability of American courts to adjudicate these disputes. Therefore, Plaintiffs submit that limited jurisdictional discovery would provide greater context to the Agreement between the United States and Jordan including information related to the referenced discussions that took place in advance of the proposal being sent by the American delegation. This is especially true where the agreement itself is informal and short in comparison to other status of forces agreements entered into by the United States. This would provide the Court with the most fulsome view of the intent of the two countries in entering the Agreement.

The D.C. Circuit has previously stated, "narrowly focused discovery may be permitted to allow plaintiffs to develop the facts necessary to support jurisdiction." *In re Papandreau*, 139 F.3d

9

247, 252 (D.C. Cir. 1998). It should also be "carefully controlled and limited." *Phoenix Consulting, Inc. v. Rep. of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Any jurisdictional discovery sought here—likely limited to seeking copies of diplomatic communications from both the Jordanian government and the U.S. Government relating to the discussions held between the two countries resulting in the drafting of the proposal that became the Agreement—would be narrowly focused.

Plaintiffs submit that its allegations are non-conclusory, and "if supplemented with additional information, will materially alter the court's analysis with regard to the applicability of the FSIA." *Crist v. Rep. of Turkey*, 995 F. Supp. 5, 12 (D.D.C. 1998). The narrow discovery being sought here would not "frustrate the significance and benefit of entitlement to immunity from suit" as it would be necessarily narrow in scope and duration. *See Polak v. Int'l Monetary Fund*, 657 F. Supp. 2d 116, 121 (D.D.C. 2009), *quoting Crist*, 995 F. Supp. at 12. The murder of three American soldiers—elite members of the Army's Green Berets—by a purported ally of the United States in violation of specific provisions of the Status of Forces Agreement in effect between the two countries warrants "a period of circumscribed jurisdictional discovery that will allow the parties to resolve the disputes" in their submissions. *See Owens v. Rep. of Sudan*, 374 F. Supp. 2d 1, 17 (D.D.C. 2005); *see also Intelsat Global Sales & Mktg. v. Cmty. of Yugoslav Posts Telegraphs and Telephones*, 534 F. Supp. 2d 32, 36 (D.D.C. 2008).

## CONCLUSION

Plaintiffs respectfully submit that Jordan has effectively waived its defense of sovereign immunity where the diplomatic status of James Moriarty, Matthew Lewellen, and Kevin McEnroe was violated by virtue of their being murdered in cold blood by an agent of the Jordanian monarchy in violation of the Agreement between the United States and Jordan. Therefore, Plaintiffs submit

that Jordan's motion to dismiss should be denied.  In the alternative, Plaintiffs respectfully submit that the Court permit narrow jurisdictional discovery to supplement the factual information currently in the record.

Dated:  April 19, 2019                                              Respectfully submitted,

**MOTLEY RICE LLC**

/S/ John M. Eubanks
Robert T. Haefele (D.C. Bar No. 1007583)
John M. Eubanks (admitted *pro hac vice*)
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
(843) 216-9000
RHaefele@motleyrice.com
JEubanks@motleyrice.com

*Attorneys for Plaintiffs*